DOA: 4/22/2025

# UNITED STATES DISTRICT COURT
for the
### District of Arizona

| | |
|---|---|
| United States of America | No. 25-6157MJ |
| v. | CRIMINAL COMPLAINT |
| Heber Samm | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

Between on or about April 1, 2025, and on or about April 18, 2025, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, HEBER SAMM, an Indian, with malice aforethought, did unlawfully kill C.S.

In violation of Title 18, United States Code, Sections 1153 and 1111.

I further state that I am a Special Agent from the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See Attached Affidavit Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:   ☒ Yes    ☐ No

AUTHORIZED BY: W. Vinnie Lichvar, AUSA
*W.V.L.*

Telephonically sworn.

Date: April 23, 2025@12:20pm

City and State: Phoenix, Arizona

JENIFER MULHOLLEN
Digitally signed by JENIFER MULHOLLEN
Date: 2025.04.23 11:10:20 -07'00'
Signature of Complainant

Jenifer J. Mulhollen, Special Agent – FBI
Printed Name and Title

Judge's Signature

Hon. Alison S. Bachus, U.S. Magistrate Judge
Printed Name and Title

## STATEMENT OF PROBABLE CAUSE

I, Jenifer J. Mulhollen, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state the following:

## INTRODUCTION AND BACKGROUND OF AFFIANT

1. I am a Special Agent with the FBI and have been since February of 2013. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in narcotics investigations, violent crime, white collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I am currently assigned to the Flagstaff Resident Agency of the Phoenix Division. I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and an officer of the United States who is authorized by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18.

2. In the course of my official duties, I am charged with the investigation of crimes occurring on the Navajo Nation Indian Reservation ("Navajo Nation") within the District of Arizona. Based on my training, education, and experience, I know that the Navajo Nation is a federally recognized tribe.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge about this matter.

## PROBABLE CAUSE

4. On April 17, 2025, at approximately 5:06 p.m., Lena Singer called the Navajo Nation Dilkon Police dispatch and stated that she had not heard from her son, C.S., in approximately two weeks. Lena told the dispatcher that C.S. and her nephew, Heber Samm, were staying at her residence in Indian Wells, Arizona, within the confines of the Navajo Nation Indian Reservation.

5. Later that same day, a Navajo Nation Dilkon Police Officer responded to Lena's residence and met with Lena's sister, Nelly Long. Nelly was with Archie Russell

and Wesley Singer. Nelly told the tribal officer that Lena had requested that she conduct a welfare check on C.S. Nelly stated that when she arrived with Archie and Wesley, no one answered the door. However, she stated that when Archie tried climbing through a window, a male inside the residence—not C.S.—waived him away.

6. The tribal officer approached the home and announced his presence, but no one responded. The tribal officer then contacted Lena and obtained consent to enter the home. After obtaining consent, the tribal officer used several tools to pry the front door open. The tribal officer noticed that there was a chair pinned against the door with a block of wood being used as an anchor to the chair. At that time, a second tribal officer responded to the residence to assist. Both tribal officers then entered the home and found Heber in the bathroom. Heber refused to comply with the officers' commands and became aggressive. He struck one of the officers in the face with his fist and resisted arrest. Heber was ultimately placed in handcuffs and removed from the home. He was charged by the Navajo Nation with Battery Upon a Peace Officer.

7. The tribal officers noted that there was no sign of C.S. in the home.

8. The following day, on April 18, 2025, Nelly and her family members returned to Lena's residence to conduct a welfare check on C.S. One of the family members noticed that a dog was digging the ground at the rear of the residence. The family member investigated the area and discovered a chest freezer buried in the ground. The family member partially opened the lid to the freezer and saw a human foot fell out. Nelly and her family members reported their findings to the Navajo Nation Dilkon Police Department.

9. Tribal officers responded to Lena's residence and confirmed discovery of the freezer. The freezer was buried in a hole that was approximately 3-4 feet deep. The top of the freezer was level with the ground. A picture of the buried freezer is included at the top of the following page.



10.     The Navajo Nation Dilkon Police Department alerted the FBI, who secured the scene until such time that a search warrant could be obtained and executed.

11.     On April 19, 2025, the FBI's Evidence Response Team (ERT) executed a search warrant at Lena's residence and surrounding property. The FBI removed a deceased human body from the freezer. The body had been dismembered and severely mutilated. Among other mutilations, the body had been cut in half below the rib cage. The eyes were missing. There were numerous apparent stab wounds all over the body.

12.     The FBI ERT recovered a burned area rug from a burn-pit located on backside of the residence. A shovel was located near the burn-pit with what appeared to be human hair on the handle.

13. The FBI ERT observed a red substance that appeared to be blood splattered on the living room wall and on the ceiling inside Lena's home. The FBI ERT located what appeared to be human hair mixed in with the red substance on the wall. The FBI collected multiple knives, handsaws, and a heavy metal object with a connected pipe on it that resembled an anvil from inside the home. The heavy metal object had a red substance on it that appeared to be blood.

14. The mutilated body was transported to a medical examiner for an autopsy. The medical examiner positively identified the body as belonging to C.S. via fingerprint analysis. The medical examiner's preliminary findings note that C.S. had approximately 49 defects to his body, which included approximately fifteen stab wounds to his backside—three of which penetrated his chest cavity resulting in a collapsed lung. Given the extent of the injuries, the medical examiner noted that C.S.'s head had been nearly severed from the body. She stated that the same was true of one of C.S.'s ankles. The medical examiner also noted that C.S.'s skull had been crushed. The medical examiner indicated that the dismemberment had likely occurred post-mortem. The medical examiner determined that the manner of death was homicide.

15. On April 19, 2025, an FBI Special Agent interviewed Lena. During this interview, Lena stated that she normally spoke with C.S. every day at approximately 8:00 a.m. She stated she had not spoken with C.S. for approximately two weeks and indicated that it may have been more than a month. A cursory review of Lena's cellphone showed a phone call to C.S.'s cellphone several days before the interview. However, the call-log entry demonstrated that the call lasted zero seconds. The cellphone also showed text messages that appear to have been exchanged between Lena and C.S. on March 29, 2025. A written entry in Lena's journal indicated that the last time she spoke with C.S. was at the end of March of 2025. Lena stated that she had given Heber's mother, Tina Samm, $250.00 on April 2, 2025, to send to C.S. via Western Union.

16. Lena stated that Heber was C.S.'s cousin or cousin-brother. She stated that C.S. told her that Heber had been living with him beginning in or around January of 2025.

Lena stated that Heber was schizophrenic. She stated that she had spoken with Tina within the last few days prior to the interview. Tina told her that Heber had seemed out of place recently. Lena stated that Tina cried during their conversation and stated: "I don't know why my son had to do this. I can't believe he could do something like this." Tina told her that she thought Heber "did it" because he always carried a knife or a machete.

17. On April 18, 2025, an FBI Special Agent interviewed Nelly Long. Nelly stated that she is Lena's older sister. Nelly stated that she normally spoke with C.S. every day. She stated that the calls between them stopped approximately two weeks prior to the interview. Nelly stated that her older brother told her that he saw smoke coming from behind Lena's residence on April 17, 2025. She stated that when she went to the house that day, she saw smoke coming from the ground and dug up a rug. She stated that the rug appeared to have blood on it, and it appeared to have been taken out from Lena's home.

18. On April 18, 2025, an FBI Special Agent interviewed Wesley Singer, who is C.S.'s biological son. Wesley stated that he had spoken with C.S. in February of 2025, while C.S. was intoxicated. During that conversation, C.S. told him that Heber wanted to kill him, but was unsuccessful. C.S. told him that he had kicked Heber out of the house. C.S. told him that Heber had come after him with an axe.

19. On April 18, 2025, an FBI Special Agent interviewed a pastor from a local church in Indian Wells. During the interview, the pastor stated that on April 1, 2025, he gave C.S. a ride to an auto parts store in Holbrook, Arizona—which was the last day he saw him alive.

20. On April 19, 2025, an FBI Special Agent interviewed Tina Samm. Tina stated that she sent $250.00 to C.S. via Western Union on either April 1st or 2nd, 2025. She stated that she called C.S. a day or two later to ensure that he received the money. She stated that Heber answered C.S.'s phone and told her that C.S. had walked away after an argument between them. Heber told her that he did not know where C.S. went. Tina confirmed that Heber was schizophrenic. She stated that when Heber did not take his medication, he became angry and paranoid. When she was told that Heber had barricaded

himself in Lena's home, Tina stated that Heber had done that before at her house. She stated that Heber would carry "weapons," and that she would take them away when she saw him. Tina stated that she did not know if Heber had anything to do with what happened to C.S. She stated that C.S. and Heber usually got along well. She denied making statements to Lena about whether her son could have done anything to Heber.

21. On April 21, 2025, I spoke with Navajo County Probation Officer Elizabeth Brown who confirmed that C.S. was on probation and that she was the assigned probation officer. She also confirmed that C.S. had been residing at Lena's residence in Indian Wells. Officer Brown stated that on March 25, 2025, at 6:35 p.m., she conducted a residence verification at Lena's residence. She stated that she conducted a walkthrough of the residence and reported that nothing out of the ordinary was observed. She stated that on April 7, 2025, C.S. failed to report to the probation office for a scheduled visit. She stated that on April 9, 2025, she called C.S. and left a message and that her call was never returned. Officer Brown stated that on April 18, 2025, at approximately 8:20 a.m., she went to Lena's residence and was unable to make contact with C.S. She stated that she walked around the house, knocked on the door, and called his name, but she did not receive a response. She stated that C.S.'s dogs looked like they were in bad condition, so she called Navajo Nation Animal Control, and the dogs were picked up and removed.

22. C.S. and Heber Samm are enrolled members of the Navajo Nation.

## CONCLUSION

23. Based on the facts and circumstances stated in this Affidavit, I submit there is probable cause to believe that the defendant, HEBER SAMM, committed the offense of CIR-Second Degree Murder, in violation of Title 18, United States Code, Sections 1153 and 1111.

//cont'd to signature page

//cont'd following paragraph 23, US v Samm 25-6157MJ

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

JENIFER MULHOLLEN
Digitally signed by JENIFE MULHOLLEN
Date: 2025.04.23 11:10:58 -07'00'

Jenifer J. Mulhollen
Special Agent, FBI

April 23, 2025
Date

Telephonically sworn on this 23rd day of April, 2025.

Honorable Alison S. Bachus
United States Magistrate Judge